

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-16-559

| | |
|---|---|
| ALYSSA EKBERG AND JERRY ASHMORE | **OPINION DELIVERED:** FEBRUARY 22, 2017 |
| APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, ELEVENTH DIVISION [NO. 60JV-14-1002] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE PATRICIA JAMES, JUDGE |
| APPELLEES | AFFIRMED |

## ROBERT J. GLADWIN, Judge

In this termination–of–parental–rights case, Alyssa Ekberg and Jerry Ashmore (the parents) appeal the Pulaski County Circuit Court's order filed April 8, 2016, terminating their parental rights to their two children, E.H. (born October 26, 2007) and H.A. (born December 18, 2013).[1] On appeal, the parents argue that there was insufficient evidence to support the allegation of abuse at adjudication, that termination was in the best interest of the children, or that the statutory grounds existed. Relying, as we must, on the circuit court's credibility determinations, we find no clear error and affirm.

---

[1]E.H.'s biological father is Robbie Harper, who consented to termination of his parental rights on January 15, 2016. Jerry Ashmore is a stepparent to E.H. and the biological father of H.A.

I. *Facts*

Appellee Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect on July 16, 2014, alleging that E.H. and H.A. were subjected to neglect and parental unfitness. The attached affidavit signed by Toni Hansberry, a social-work specialist for DHS, contained statements that DHS received a maltreatment report on May 9, 2014, alleging that E.H. had "major" deep, bluish-red bruises that covered his whole bottom; that the parents whipped E.H. with a board; that Jerry "hangs E.H. upside down by both feet in the closet"; and that when this occurred, E.H. could not "bend up" to untie himself.

The affidavit stated that Betty Banks was assigned to the investigation, that Banks observed bruising on E.H.'s bottom, and that E.H. had told Banks that his stepdad, Jerry, spanked him with his hand and a big piece of wood, described as rectangular and kept by his parents in a box. The affidavit alleged that E.H.'s school staff observed the bruises and that E.H. was consistent with his story. Further, E.H.'s mother, Alyssa, was shown the pictures of the bruising and blamed it on a chair that the child had used. Alyssa also told Banks that it had been a while since she had "busted [E.H.'s] butt," then changed it to "two weeks ago."

The affidavit stated that Banks completed her investigation and found a preponderance of evidence to support the allegation of physical abuse. She found that the parents, who were not married, and Jerry's mother, Katrina Ashmore, were or had physically abused E.H. Banks learned that the family had a "maltreatment finding in Texas alleging

physical abuse" of E.H. by the parents but that they had moved to Arkansas before participating in and completing services.

The affidavit alleged that DHS opened a protective-services case on the family. Nicky Baker and Hansberry went to the parents' home on June 25, 2014, to make the initial contact, and no one was home, so they left a note for the parents to call Baker. On that same day, Alyssa phoned a county supervisor and complained that someone had come to her home, and she "indicated" that she was not going to participate in services without a judge's order. Baker called Alyssa on June 26, 2014, and there was no answer or return call. Hansberry called Alyssa on June 27, 2014, and there was no answer, so a message was left for Alyssa to call Baker. Alyssa called Baker and advised that E.H. was in residential care, and that she was not going to tell Baker where and was not going to participate in services without a court order.

The affidavit described that Baker and Hansberry obtained assistance from the Pulaski County Sheriff's Office on July 1, 2014, to conduct a welfare check. When they arrived, Jerry was in front of the home with H.A., Jerry's mother, and another man. Alyssa was at work. Jerry told them that E.H. was in Pinnacle Pointe Hospital in a residential program and had been there for two weeks. He was told to have Alyssa call Baker when she returned. Alyssa called to "resolve the issues." She was told by Hansberry that the issues could not be resolved due to the allegations and a case having been opened. When the workers returned to the home, Alyssa would not allow them inside, but they stood outside and talked. The affidavit described Alyssa as hesitant about participating in services, cooperative in providing

information about E.H.'s biological father, and "acknowledging the situation that warranted the agency's becoming involvement [sic] with their family."

Finally, the affidavit stated that Hansberry contacted "Texas CPS," and it "stated that there had been an open case on the family as a result of Mr. Ashmore physically abusing E.H. and that it closed its case after the family moved to Arkansas." Robbie Harper, E.H.'s biological father, told Hansberry that the Texas case required that Jerry "not be around E.H. until he received parenting classes and anger management."

An order removing the children from their parents' custody on a seventy-two-hour hold was filed on July 17, 2014. The circuit court found that it was contrary to the children's welfare to remain in their home and that removal was in their best interest. The order states:

> These findings are based on the affidavit presented with the Petition, which outline a small child that has been the victim of severe abuse. His mother is in denial about the nature and extent of his injuries. The adults in the home have been uncooperative with DHS thus far. The Affidavit notes that there was a true finding of physical abuse against [E.H.] in Texas, but the family moved to Arkansas before participating in services. DHS has been attempting to work with this family for almost a month, investigation time notwithstanding, and the adults have been entirely unresponsive to DHS requests. There is no information presented to lead this Court to believe mother or any putative fathers will be more receptive this time if maintained as a "thirty day" petition. The Court likewise finds that these reasons for removal are necessary to protect the health and safety of both juveniles.

A probable-cause hearing was held on July 21, 2014, and the order from that hearing sets forth Hansberry's testimony that Robbie Harper had contacted her and said that there was a case in Texas and that he had temporary custody of E.H. while Alyssa and Jerry participated in services there. Harper told her that Alyssa had checked E.H. out of school and moved to Arkansas. Hansberry testified that Alyssa was participating in therapy with

E.H. at the residential-treatment center. The circuit court found that probable cause existed based on the affidavit, and it continued to exist because "DHS has not yet had time or opportunity to fully investigate the matter such that this Court would be comfortable returning either of the children to the home." The circuit court ordered that Alyssa's visitation would be supervised twice a week; Jerry would have supervised visitation with H.A. twice a week; visitation was contingent on negative drug screens; both parents were to participate in random drug screens; and both parents were to complete a drug-and-alcohol assessment, counseling, psychological evaluation, and parenting classes. Further, the parents were ordered to establish paternity; maintain stable housing, employment, and income; keep DHS informed of their address, telephone numbers, and employment; and Alyssa was to participate in E.H.'s therapy as deemed appropriate by his therapist.

The adjudication order filed on September 15, 2014, recites the testimony by Betty Banks that E.H. had told her he had been in trouble at school so he got a whipping with a rectangular board by Jerry, who kept the board in a box. She took pictures of the bruises, and Alyssa had told her that she did not know how he got the bruises. She testified that there was a true finding that Jerry was the offender of physical abuse against E.H. She also testified that she had "called Texas" and learned that a case had been opened on Jerry for physical abuse. That case was closed when the parents moved to Arkansas without completing services. Banks, referring to Texas, testified that "they only said there was a case open involving physical abuse and Jerry." She stated that Jerry's mother and grandmother may have been involved in the abuse, but "there is no finding against mother."

The adjudication order also summarizes Alyssa's testimony that she had been living with Jerry for two years, and she did not believe that he had abused E.H. in Texas because it was an accident. She was at home when Jerry had spanked E.H. with a belt. She said, "E.H. ducked out and went to leave, punched Jerry, and went out of the room." Jerry did not go after him, and Texas DCFS got involved. She went to parenting classes and counseling, and E.H. stayed with Robbie Harper, his biological father. When Jerry moved to Arkansas to help his grandmother, who was fighting cancer, Alyssa later moved to help him. She stated that she did not believe that child abuse had occurred in Arkansas. She believed Jerry when he denied spanking E.H. The order states, "She understands that if Mr. Ashmore does not comply, her future is tied to his if she is with him. If he did not finish, she would 'remove herself from the situation.'" E.H. has ADHD, bipolar disorder, and anxiety. He went to Bridgeway, Rivendell, and Pinnacle Pointe treatment facilities. Alyssa testified that she participated in counseling with E.H. and enjoyed it. She stated that part of the Texas order was that Jerry was not supposed to be around her son. She said that E.H. had undergone behavioral treatment in Texas before the Texas case was opened, and Texas DCFS gave E.H. back to her when Jerry moved to Arkansas.

The order also reflects that Jerry admitted that he had spanked E.H. in Texas, and he said that he had been aware of Texas's restriction on him being around E.H. He did not complete anger-management classes in Texas, and he was told that he could not see E.H. if he did not complete those classes; but he was told that he could complete them in Arkansas if he paid for them. He said that he did not know how E.H. got the bruises this time, and he denied doing it. He said that he could benefit from parenting classes and that he had no

criminal history. He had been involved with E.H.'s therapy in Texas, and the therapist there told them that spanking with the belt was the last means necessary. He said when he spanked E.H. in Texas that day, he was not angry, and he had not used excessive force. He had talked to E.H. beforehand, E.H. had his clothes on, and they had checked on E.H. after he had run out of the room. He said that he first saw the bruise when the pictures were sent from Alyssa's sister's phone to Alyssa's phone. He said that he planned to remain with Alyssa, and he said that he had been "buffaloed" by Texas CPS. He thought that E.H. had gotten the bruises this time from a child-sized outdoor lawn chair. He testified that E.H. had been spanked in Arkansas a month or two weeks before the incident.

The adjudication order also reflects that Toni Hansberry testified that the parents had been cooperative and had made the scheduled visits with H.A. She said that the Texas case was not a foster-care case. She recommended that Jerry needed a stand-alone anger-management course and that it should be "incorporated into therapy." She said that, even though the original court report recommended that H.A. go home, DHS now wanted more services in place before moving him home. She said that Alyssa believed Jerry over her child.

The order states that Robbie Harper testified that he had been arrested for assault August 23, 2014, for chasing and beating a man who had stalked his wife, and he said that those charges were "all dismissed so far." He also said that E.H. had accused him of sexual abuse, but he was found not guilty. He insisted that the parents were found by Texas CPS to have committed physical abuse of E.H.

The circuit court found by a preponderance of the evidence that the children were dependent-neglected, having been subjected to neglect and parental unfitness. The goal of the case was reunification or placement with an appropriate relative with a concurrent goal of adoption. The court found that Alyssa failed to protect E.H. from abuse by Jerry when she had reasonable cause to know that the child had been abused by him in the past. The circuit court found:

> The family had an open case in Texas for the exact same reasons we are here today, yet she still allowed Jerry to physically discipline E.H. It is the court's belief that Jerry Ashmore caused the injuries to E.H. that caused the current case to be opened, and the court agrees with DHS's true finding of abuse against Jerry Ashmore with regard to E.H. . . . Although H.A. has not yet been abused, to this Court's knowledge, it does not have to wait until harm befalls him to extend protections to him as well. [The parents] circumvented the DCFS case in Texas and its rules, and there is no comfort level that they would not just pay lip service to this court's orders as well. E.H. has a lot of problems that children are not born with; these are environmental problems.
> . . . .
>
> The court advises all parents that they must show a sustained improvement and demonstrate benefit from services received to be viable placement options. Checking off boxes, jumping through hoops, and lip service is insufficient to sustain a goal of placement or reunification. E.H. has been victimized at least twice; this Court [is] going to ensure as best it can that he will not suffer such abuse, neglect, or parental unfitness in any other placement over which this court has control. The court cannot ignore that E.H.'s behavioral counseling and issues seem to coincide with the time Mr. Ashmore became involved with the mother.
>
> If the parents would have complied with services initially, these parents would not be in this courtroom. It was only when a thirty-day petition was filed, it was [sic] this court took the hold. The parents now have what they wished for, and a judge will tell them what to do and what services they will complete.

The permanency-planning order, filed May 27, 2015, contains another lengthy synopsis of the testimony of each witness at the hearing. Baker testified that Alyssa had completed her psychological testing, had attended counseling, and had submitted to drug

screens, and that DHS's goal remained reunification with Alyssa. She also said that E.H. had been in inpatient treatment at Pinnacle Pointe from June 11, 2014, until March 24, 2015. Lynn Hemphill testified that he is the therapist who had seen the parents twice a week since April 14, 2015. He also had met with E.H. in his foster home on two occasions. Hemphill stated that he did not know that Jerry was not supposed to have contact with E.H. when they came from Texas, and he had been told that there had been an allegation in Texas that was investigated, and that during that time, E.H. had stayed with his mother's sister until they went through classes, and he was then reunified with his parents.

Jerry testified that H.A. was his biological child, and they had good visits during which he used some parenting techniques he had learned through his classes. He said that he had learned to express himself more effectively, they had discussed that Alyssa would be the primary disciplinarian for E.H., and they would consult with each other before any decisions were made involving E.H. He said that corporal punishment would not be used, and it had no effect on E.H. He said he had enjoyed the therapy sessions with Mr. Hemphill, and he had high hopes that continued therapy would work. He said that he had spoken with Texas CPS and was told that he could not stay in the apartment in Texas as long as Alyssa and E.H. were there but that Texas would have no control over what happened if they were to move to Arkansas. He said that he knowingly had Alyssa come to Arkansas instead of going back to Texas. He said that he had participated in E.H.'s therapy at Pinnacle Pointe for a month before DHS took custody. Alyssa testified that she had participated in and benefited from the services. She said that she would not use corporal punishment and that she planned to marry Jerry.

The circuit court noted that the parents had completed the services and had sometimes pushed for things to happen. However, the court found that it could not "yet say the parents have made substantial progress." The circuit court ordered that family therapy between E.H. and Jerry would not take place until Hemphill "gets full disclosure," which included his obtaining a copy of the psychological evaluation. The court found that if Hemphill then believed E.H. should be involved in therapy with Jerry, the court would allow it. The circuit court stated in its order:

> These parents are going to have to show changes. They have not been honest with Mr. Hemphill; he was unaware of half the history he heard today. They may not agree with the psychological, but right now it is ringing true. They have taken no accountability, and they need to be more honest with themselves. If there is no marked change and ownership presented at the next hearing, goals of the case will change.

The fifteen-month permanency-planning order filed August 12, 2015, contains synopses of the witnesses' testimony. Mr. Hemphill testified that he was the family's therapist, seeing the parents as a couple and Alyssa and E.H. together on another day each week. Hemphill described E.H. as emotionally charged, requiring a great deal of guidance, redirection, and supervision. He said that E.H. was impulsive and not always truthful. He said the parents denied having caused the injury to E.H., they acknowledged that E.H. had been in their home, and it had been their responsibility to ensure his health and safety. He described the parents as being at a "crossroads" as to how the injuries occurred. He said he did not want to integrate E.H with both of them if "this cannot be established." He said that, unless it was certain that reunification would continue, he did not want to reintroduce E.H. into therapy with both parents. He said that Jerry had acknowledged that he caused the injuries in Texas and that he did not comply with the case plan and recommendations,

which in hindsight was inappropriate. He said the parents told him that Alyssa was pregnant several weeks before the last staffing. He did not recall them mentioning that they were married during the last staffing, even though that had been their plan. He had visited their home once a week since May 2015, and he believed that with adequate services, they could keep a safe home environment for the children. He said that without therapy with Jerry, and without services in place, E.H. could not safely return home. He said that E.H. recanted several times in therapy. E.H. had told him that he had been jumping high on the bed and he had fallen, hitting a chair.

Nicky Baker testified that DHS recommended that the goal of the case be changed to adoption and pursuit of termination of parental rights for both children. The basis for the goal change was that returning the children back in the home would be detrimental. "[T]here has not been accountability or responsibility, and there has not been an acknowledged offender. The injuries occurred when he was in the home with the parents. These issues cannot be remedied in a short amount of time." He testified that E.H. and Jerry had not had visitation, and E.H. had never recanted to him. However, he said that Mr. Hemphill and the foster parents had shared that E.H. had recanted. He said that the parents never told him that they had married; he found out by reading it in the newspaper, and he was surprised to find out in July that Alyssa was pregnant.

Toni Hansberry said that the parents failed to tell DHS they had been married, and they did not tell anyone prior to the staffing that "they were pregnant." Hansberry said that "it goes to show the parents do not make the best decisions." She said that the parents had not acknowledged how E.H.'s abuse occurred, and "this all causes DHS concern." She said

that the parents were not ready for a trial placement. "At some point, someone must step up and acknowledge that something did happen, accept responsibility for it, and work through it. That has not happened yet." Hansberry acknowledged that Alyssa usually managed both children pretty well. She said that Jerry had slept during visits with H.A. and that Alyssa had been more interactive in the visits.

The children's foster mother testified that E.H. talked to her about going back to his mother and no one else. She said that, two to three weeks prior to the hearing, E.H. told her that he and his mother had been wrestling and playing on the bed, and that he fell and hurt his bottom. He also said that he had been sitting on a chair and that it had broken and hurt his bottom. He said it was on the same day. He said that he told his mother he had bruises, and she told Jerry. He said that he was mad at Jerry and wanted him out of the house, so he told his teacher, who saw the bruises, that "Jerry did it." She said that E.H. takes instruction better from women than from men. She said that E.H. struggled with being truthful and that he fabricates stories about everything, not just to get out of trouble.

Alyssa said that she had never tried to conceal the new pregnancy and that therapy with E.H. was hard at first but was now "going great." She does not believe Jerry caused the injuries to E.H., although she believes he did in the Texas case. She said it was her responsibility to discipline E.H. She said that she was not sure what caused E.H.'s injuries in this case. She said that Jerry has other children, twin boys that are five or six years old, but she did not know where they lived.

Jerry testified that falling asleep during visitation was a problem, so he had asked to move the visitation based on his work schedule. He admitted the Texas spanking and

bruising and said that he never gave E.H. corporal punishment in Arkansas. He said that he took responsibility for it because it had occurred in his household. He said that he was willing to participate in any other services and that he was fearful. He denied concealing the current pregnancy from DHS or Hemphill. He said Hemphill knew of his other children and he had been completely honest with Hemphill. He said the twins' birthday was November 31, 2010. He had no idea what caused the bruises on E.H., and he considered saying he did it just so there would be an answer. He said that he had noticed the bruises the day before E.H. went to school. He said E.H. had walked by Alyssa when he was going to the bath, and she had noticed them, but E.H. could not answer how he had been bruised.

The circuit court found that the parents had participated in services but had "paid lip service and jumped through hoops, and the Court sees no real evidence of progress or change. We are at the fifteen-month review mark, and there are still more questions than answers." The goal of the case was changed to adoption, proceeding toward termination of parental rights. The court found that DHS had made reasonable efforts to provide services and achieve the goal of the case. The court noted as follows:

> There are big problems with truthfulness and credibility in this case. Mr. Ashmore's testimony today about mother's knowledge of the May 2014 bruises is in direct contradiction to statements mother made to the investigator as contained in the affidavit with the Petition in this case. Today, we find out that Mr. Ashmore has other children in an undetermined location. The Court takes judicial notice of the fact that November only has 30 days, in contradiction of the date of birth Mr. Ashmore gave for his twin boys in Mississippi. Mom is pregnant again, and they got married since the last hearing. There always seems to be a new issue or disclosure or "oops" at each hearing we have, and these two children are languishing in foster care in the meantime. [E.H.] is a handful on his own. Three children of young ages are difficult to manage even if the children themselves are well-behaved. Having a child in the middle of this DHS case is ill-advised, even if not planned.

Reunification is not imminent, in any way. The parents were given three more months because Mr. Hemphill learned new information for the first time at the last hearing. Then today, Mr. Ashmore said he has been "completely honest" with his therapist from the beginning. They have worked on nothing with E.H. and Mr. Ashmore. Mr. Ashmore was found to be the perpetrator here and in Texas. Ms. Banks considered the grandmother and great grandmother as perpetrators but dismissed them. The great-grandmother was sick with cancer such that she required Mr. Ashmore to move to Arkansas to assist her care, but now she is named as a possible perpetrator. These bruises were not an accident. This was not a "jumping on the bed bruise." Photos of the bruises were previously admitted into evidence. Prior statements were that mother never saw the bruises, but now today she saw them at bath time. The Court thought great strides would be made in those three extra months; that did not happen. No one is still claiming responsibility for this child's injury. They had a plan when they left Texas, and that did not work, and the Court is hearing the same "plan" today for how to keep E.H. safe when it clearly did not work the first time.

The Court has concerns about these parents supervising E.H. around a toddler and a future infant. He requires a lot of watchful eyes, and that clearly did not happen in the mother's and Mr. Ashmore's home prior to removal.

DHS filed a petition for termination of parental rights on October 2, 2015, and alleged the grounds pursuant to Arkansas Code Annotated section 9-27-341 (Repl. 2015) as follows:

A. That a juvenile has been adjudicated by the court to be dependent neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.
. . . .

B. That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.
. . . .

C. A parent has subjected any juvenile to aggravated circumstance. Aggravated circumstances means: A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification; or have had his or her parental rights involuntarily terminated as to a sibling of the child[.]

## II. *Termination-of-Parental-Rights Order*

A termination–of–parental–rights order was filed on April 8, 2016, after a two–day hearing, and the circuit court terminated the parental rights of the parents as to E.H. and H.A., finding that it was in the children's best interest. The circuit court based its finding on all three grounds as alleged in DHS's petition. The circuit court's order recites the history of the case and quotes its order removing custody of the children from the mother, the adjudication order, which was not appealed, the permanency–planning order, and the fifteen–month permanency–planning order.

Dr. Deyoub testified at the termination–of–parental–rights hearing, and his report states in part as follows:

> If the court is going to pursue reunification with Alyssa Ekberg she requires parenting classes, individual therapy, and the same would be required of Mr. Ashmore plus he would have to complete anger management which he never did. They have to do these requirements regardless of whether E.H. is returned to them or not because they have another child in custody that they are seeking to have reunification with. It is my opinion that they should be given the opportunity for a reunification for H.A. since this child is only one year of age. It is the biological child to this couple and as long as they work the reunification plan they should be able to seek reunification with H.A. it will be imperative that they complete all of the individual therapy, parenting classes, and anger management classes and in fact I think Alyssa should attend the anger management as well. They should have to prove that they have a stable place to live and adequate income. While they may ultimately be successful in gaining custody of the baby, I have major concern for E.H.'s safety. They both, especially the mother, acknowledges that E.H.'s behavior is out of control. We have now two occasions where this child has been significantly abused. The live-in boyfriend will not take responsibility for what he did, he was never charged criminally and the two of them are just blowing this off as if nothing

happened to E.H. Because of the extent of this bruising on now two occasions and the attitude of the parents, I simply cannot see how E.H. can be returned to their custody.

The court's termination order states:

[E.H.] is a troubled child. However, this Court is not reaching its decision today based solely on allegations made by a troubled child. This Court is looking at the totality of the evidence, which includes the Texas case that is referenced both *supra* and *infra*.

. . .

Harrison Williams is the therapist that worked with Mr. Ashmore from September 12, 2015, until December 12, 2015. His initial testimony was that he had no concerns involving Mr. Ashmore, and that he should receive "full reunification efforts" with the children. He also testified that Mr. Ashmore never admitted to intentionally or accidentally bruising [E.H.], in Arkansas or in Texas. Mr. Williams admitted that, had Mr. Ashmore acknowledged leaving bruises on [E.H.] at all, the treatment goals would have changed, and they would have worked on more effectively parenting without using corporal punishment. The Court therefore cannot give great weight to Mr. Williams' testimony about any perceived progress in Mr. Ashmore's therapy when there clearly was not full disclosure or admission by Mr. Ashmore to his therapist.

Lynn Hemphill worked with the parents beginning in April 2015 until December 2015. . . . However, Mr. Hemphill said that Mother's testimony that the bruises to [E.H.] that caused him to come into foster care "weren't anything big to [her]" because [E.H.] "didn't make it a big deal," that [E.H.] had not been abused, and that the bruises had been made into a "big deal" did not square with what they had discussed in counseling. Likewise, when presented a transcript portion from a prior hearing where Mr. Ashmore said that he was not a child abuse perpetrator, and that a person has to strike a child with the intent to leave a bruise for an incident to be abuse, Mr. Hemphill testified that those statements also did not square with what they discussed in counseling. Mr. Hemphill then could not say that progress had been made.

Karen Lambert testified that she was [E.H.'s] therapist at Pinnacle Pointe from June 2014 until March 2015. She testified that she had no reservations about [E.H.] being returned to the care of mother and Mr. Ashmore. Her observations, however, were based on the two sessions of therapy that Mr. Ashmore participated in prior to the seventy-two (72) hour hold in this matter nineteen (19) months prior, as well as her observations of Mother's supervised interactions with [E.H.] during once weekly supervised family therapy. She further testified that [E.H.] did not exhibit fear around Mr. Ashmore; that [E.H.] was happy and gleeful, overanimated, would hug Mr.

Ashmore, and would sometimes call him "dad." She admitted that children who have reactive attachment disorder (RAD) tendencies such as [E.H.'s] might be happy to see strangers or even abusers; however, she said that other children who have been physically abused typically showed a much different display of nonverbal communication than [E.H.] does with Mr. Ashmore. The abused child would shy away from the abuser, and that was not the case with [E.H.] and Mr. Ashmore. This analysis, however, completely discounts that Mr. Ashmore admitted to administering the corporal punishment in Texas that was found to be physical abuse. When asked whether [E.H.] ever showed self-harming behavior, Ms. Lambert identified an incident where [E.H.] pulled his own tooth, but she claimed that the tooth was not loose. She further noted that this was based on her memory, this was not documented as an incident, and she was not sure whether the tooth was a "baby" tooth or a permanent tooth. The Court cannot give this testimony weight towards a propensity for [E.H.] to self-harm when Ms. Lambert, his therapist at the time, did not document it as such. She further testified that [E.H.] broke his arm due to climbing on top of playground equipment and jumping off. Likewise, the Court would be hard-pressed to find this to be an act of intentional self-harm on [E.H.'s] part.

Jessie Green testified that she has been a CASA since July 2015 and was the CASA assigned to this matter since August 2015. She testified that she has seen [E.H.] at least every other week, sometimes more frequently, since her assignment to this matter. Ms. Green testified that she has observed Mother's visitation with [E.H.] over a dozen times. She testified she has observed visitation between [H.A.] and mother, and she had one observation of [H.A.'s] visitation with his father. The Court did not get a good sense that Ms. Green had a grasp of the prior history of this family and these juveniles, which directly impacts the case at hand. Ms. Green's testimony boiled down to the following: [E.H.] makes up a lot of stories; Mother is appropriate with [E.H.] when she observes the two together in a therapeutic setting; and she has no concerns about Mr. Ashmore after seeing [H.A.] with his father one time. She admitted to having no actual training in child abuse, and her recommendations appear to this Court to be based mostly on public observation of the Mother and private conversations with a troubled child. As such, the Court cannot assign any significant weight to those recommendations.

At the termination hearing, the mother and Mr. Ashmore introduced into evidence, over objection, a copy of the administrative order from the Office of Appeals and Hearings removing Mr. Ashmore from the Child Maltreatment Registry. (Defendant Parents 2). This document carries no weight with this Court. As indicated in the body of the order and Mr. Ashmore's testimony, there was no DHS representative or witnesses present at that administrative hearing. There is very little indication of what evidence the hearing officer took into consideration, aside from the "de-identified investigative file from DCFS" and the testimony of Mr. Ashmore, Mother, and three character witnesses for Mr. Ashmore. The Court notes that this administrative hearing was conducted on December 15, 2014, well after the

September 15, 2014 adjudication hearing in this matter. The Court views the introduction of this document into evidence as no more than an attempt to relitigate the adjudication, which is expressly prohibited by *Neves da Rocha v. Ark. Dep't of Human Servs.*, 93 Ark App. 386; 219 S.W.3d 660 (2005), cert. denied 549 U. S. 811, 127 S. Ct. 346 (2006).

12. Mother and Mr. Ashmore completely lack credibility with this Court. Their different accounts, explanations, and obfuscations are too numerous to count.

The circuit court found by clear and convincing evidence that the parents were not capable of safely caring for the children. The court found that there was too much inconsistency and that too many "games" had occurred for it to believe that either child could safely be returned home. The court found that "these parents are still in deep denial not only about the abuse that occurred to [E.H.] in Arkansas, but also with regard to the prior abuse to him in Texas." The court found that, after nineteen months of services and extensive counseling, the conditions that had caused removal still existed. The circuit court noted that the parents continued to "suggest other people" may have been responsible for E.H.'s bruises, if they were not caused by the chair that was testified to by the parents but never produced as evidence. The circuit court's order states:

> The underlying problem is that [E.H.'s] early chaotic, unstable environment helped create his disorders and behavioral problems, which Mother and Mr. Ashmore attempted to resolve by using or sanctioning physical abuse. The Court finds it is not possible to safely return [E.H.] to the custody of his mother at this time, and given the lack of therapy between [E.H.] and Mr. Ashmore due to Mr. Ashmore continuing to deny he perpetrated abuse on the child, the Court does not believe it would be possible to ever return [E.H.] to that home and that termination of parental rights is appropriate. *McDaniel v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 263. Although [E.H.] has been the target of abuse so far, the Court believes that [H.A.] would be at risk if he were returned to the home as well. The Court finds that returning [H.A.] to the home of the parents, with or without [E.H.], would risk subjecting him to the same dysfunction that shaped [E.H.'s] issues, and in turn would subject him to the potential for abuse as a means of discipline. The harm referred to in the termination statute is "potential" harm; the trial court is not required to find that actual harm will result or to affirmatively identify a potential harm. *Fox v.*

SLIP OPINION

*Arkansas Department of Human Services*, 2014 Ark. App. 666, 448 S.W.3d 735; *Welch v. Arkansas Department of Human Services*, 2010 Ark. App. 798, 378 S.W.3d 290. Moreover, evidence on this factor must be viewed in a forward looking manner and considered in broad terms. *Fox, supra.*

An appeal timely followed, but we ordered rebriefing on November 9, 2016, when the parents' appellate brief did not comply with our rules. *Ekberg v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 536. The parents have cured the deficiencies in their brief now before the court.

### III.  *Law*

The applicable law and standard of review for appellate courts was recently set forth as follows:

> We review termination–of–parental–rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341. In making a "best interest" determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted, and (2) the potential of harm to the child if custody is returned to a parent. *Id.* Adoptability is not an essential element but is rather a factor that the trial court must consider. *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the "best interest" finding that must be supported by clear and convincing evidence. *Id.* The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Credibility determinations are left to the fact-finder. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 370.
>
> . . . .
>
> The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed

19

from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). This need for permanency overrides a parent's request for additional time to improve circumstances, and courts will not enforce parental rights to the detriment of the well-being of the child. *McElwee v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 214, at 7, 489 S.W.3d 704, 708. Arkansas Code Annotated section 9-7-338(c)(1)−(7) lists the permanency goals that the circuit court is to consider in determining the best interest of the children. The top preference is to return the juvenile to the parents if it is in the best interest of the juvenile and the juvenile's health and safety can be adequately safeguarded if returned home. Ark. Code Ann. § 9-27-338(c)(1)−(3). Adoption is then listed before permanent placement with a relative, unless the juvenile is being cared for by a relative and termination of parental rights is not in the best interest of the juvenile. Ark. Code Ann. § 9-27-338(c)(4) & (6).

*Villaros v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 399, at 4−6, 500 S.W.3d 763, 766−67.

### IV. *Sufficiency of the Evidence Regarding Allegation of Abuse*

The parents contend that there was insufficient evidence that they had abused E.H. to support a true finding of abuse or maltreatment. They argue that, even though a party must appeal an adjudication, this court must view termination cases de novo, and they contend that the record is silent as to whether either parent was advised of his or her right to appeal the adjudication. They claim that Jerry was without counsel until the termination hearing. They assert that the case began when school officials reported that E.H. had red marks and bruising on May 9, 2014, and he told them that his stepfather beat him with a board and hung him upside down in the closet. They offer that they were less than cooperative and weary with DHS because of their experience in Texas. They claim that DHS did not have documentation of the Texas case but believed Robbie Harper's claim that Texas had made a maltreatment finding and that they had left the state before participating in services. They argue that "this was not correct" but was repeated in "virtually every court report, petition, and order." They argue that services in Texas were

voluntary and that there was no court case or any true finding of abuse placing Jerry on any maltreatment registry.

They contend that, from the adjudication order and throughout the case, DHS and the circuit court stated that it had been proved by a preponderance of the evidence that Jerry had abused E.H. The order placing the children with DHS found that E.H. had been the victim of "severe abuse," but the parents assert that no law enforcement was informed nor consulted, no criminal charges were filed, and no referral was made to the Child Advocacy Center where a forensic interview might have revealed that E.H. had fabricated the claim of abuse. They contend that the only medical examination of E.H. was done when Alyssa took him to be examined the day after she had learned of the hotline call.

They claim that they both denied abusing E.H. and that they believed the bruising was most likely caused by a plastic chair E.H. had been injured on before and about which he had been warned not to play. E.H. told his foster mother that he had injured himself by jumping on the plastic chair. The parents argue that DHS never bothered to follow up on this allegation.

The parents cite Karen Lambert's testimony, emphasizing that she believed that E.H. had significant issues with lying, telling tales, and accusing others, including children, of hurting him. She also testified that E.H.'s pulling out his tooth that was not loose was a self-inflicted injury. Finally, she testified that she was skeptical when she learned of the abuse allegations. They also cite the testimony of Harrison Williams, Jerry's therapist, who stated that Jerry had made progress each month and that the treatment goal was anger management. He stated that he did not see any evidence that Jerry had issues with anger

and that he had no reservations about Jerry having custody of his children. Finally, the parents cite Lynn Hemphill's testimony that he conducted therapy with the parents as a couple and some with E.H. They contend that the circuit court was inconsistent in its rulings regarding the Texas case and allowed the Texas case to be used to bolster the finding of abuse in Arkansas. They assert that Hemphill stated that E.H. blames others and makes false accusations against others, including the foster father, and he did not have any problems with Alyssa's parenting of E.H. He said that both parents had made significant progress and that they did not show signs of anger-management issues.

The parents complain that the pictures, shown repeatedly by the attorney ad litem, were obtained from Robbie Harper and were never part of the Texas case, although they were admitted without objection by prior parent counsel. "The theme that the parents are untruthful and generally bad actors was reinforced in every petition, report, and order, rather than citing actual evidence that Jerry abused E.H. and not that E.H. more than likely injured himself." Also, they complain that the "narrative that they hid their marriage and pregnancy" was promoted "as if either of these issues proves abuse." The parents point to the circuit court's taking no notice of the fact that Jerry, acting pro se, appealed the true finding of abuse through the DHS administrative-appeal process when he received a letter that he was to be placed on the child-maltreatment registry, and he prevailed. The administrative law judge ruled that the child was not credible and unsubstantiated the abuse allegation after having reviewed the DHS file. The parents note that when Alyssa gave birth to a boy on January 5, 2016, DHS opened another case, but after Judge James's recusal, another judge dismissed the case at adjudication and returned the baby to the parents.

The parents contend that there was no evidence that Jerry abused the child, and every expert that treated E.H. stated that he had recanted, that he habitually and pathologically lies, and that they had no issues with the children being reunited with their parents. They argue that there was insufficient evidence to prove by a preponderance of the evidence that either parent abused E.H.

DHS and the attorney ad litem filed a joint brief in response to the parents' appeal. They contend that the trial court's findings regarding the suspected abuse of E.H. was litigated and determined at the dependency-neglect adjudication hearing, and no appeal of that order was filed.

Under Arkansas Supreme Court Rule 6-9(a)(1)(A) (2016), adjudication orders are considered final and appealable orders. The parents were entitled to appeal, and they did not. Even though the record on appeal includes the orders from all of the prior hearings, this court is precluded from reviewing any adverse rulings from these portions of the record that were not appealed. *Lewis v. Ark. Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005). Accordingly, we hold that sufficient evidence supports the circuit court's finding of abuse.

## V. *Failure to Remedy*

Regarding the statutory ground alleged pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)*—a dependent-neglected child has been out of the parents' custody for more than twelve months and there has been a failure to correct conditions that caused removal—the parents admit that the children were out of their custody for twelve months, but they contend that it was through no fault of their own. They argue:

It is disingenuous to obstruct a requirement of rehabilitation then allege that despite meaningful efforts by DCFS to rehabilitate the parents have failed to make meaningful progress. The parents have done all that was asked but even in the court's adjudication order it states that, "checking off boxes, jumping through hoops, and lip service is insufficient to sustain a goal of reunification." In the case of appellants it appears short of admitting to abuse they steadfastly deny and experts have supported them, there seems to be nothing these parents could have done to satisfy DCFS entrenched in its own narrative.

The parents contend that the goal of the case was reunification until August 2015, despite the parents' consistent denial of abuse. When the circuit court became aware that Alyssa was pregnant and that the parents were married, it was argued that they had been dishonest and were hiding these facts. However, they both testified that they had informed their therapist and others at DHS, but their caseworker had not answered his phone and his voice mail had been full. They argue that all three therapists opined that E.H. and Jerry would benefit from joint therapy, but Mr. Hemphill stated that it would be of no benefit if the goal was changed to adoption, and therapy was made impossible by the no-contact order imposed by DHS. They contend that Jerry had been participating in therapy with E.H. at Pinnacle Point when E.H. was taken into custody by DHS, and the therapy was stopped at DHS's direction. Therefore, the parents argue that there was nothing they could have done to satisfy DHS short of admitting abuse.

The circuit court's true concern was the parents' inability to be frank or forthcoming with the court regarding the child's injuries and their responsibility to take affirmative steps to protect the children. The circuit court's lengthy order describes the parents' explanations and obfuscations as too numerous to count and that it did not believe that the circumstances would improve with further counseling. Failing to take responsibility for a child's injuries or the circumstances that led to them—including a failure to protect—supports a finding

Cite as 2017 Ark. App. 103

that the parents failed to remedy the conditions that led to removal and demonstrates incapacity or indifference to remedy issues that arose subsequent to the removal and little likelihood that continued services would result in successful reunification. *E.g.*, *Nguyen v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 565; *Harper v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 280, 378 S.W.3d 884; *Mason v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 251. Because DHS is required to prove only one statutory ground for termination, it is not necessary for us to consider the parents' remaining arguments regarding aggravated circumstances and subsequent factors, the other two statutory grounds listed in the petition. *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495.

### VI.  *Best Interest of Children*

The parents argue that the circuit court failed to state what clear and convincing evidence it had that it was in the children's best interest to terminate parental rights, thus leaving them orphaned.  They argue that the record is clear that the only thing they have failed to do is admit to abuse.  They contend that the circuit court's quoting of statutory requirements does not meet the very high burden that must be shown in order to impose the extreme sanction of losing one's children.

The parents also contend that the circuit court failed to articulate the statutory requirement that there was evidence that the children would be adopted.  Although they acknowledge that there would be potential adoptive parents for H.A., they argue that E.H. is another matter, as he did not survive being in the same foster home as his brother and has been institutionalized by DHS since he has been in its custody.  They contend that there was no evidence or witnesses called to speak to his true issues and the likelihood of his being

adopted. They assert that stating that a computer search turned up potential adoptive parents is not evidence. They contend that DHS did not meet its burden in showing by clear and convincing evidence that it is in the children's best interest that their parental rights be terminated.

Termination of parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the child, including consideration of such factors as the likelihood of adoption of the child. *See* Ark. Code Ann. § 9-27-341(b)(3). Adoptability of the children is but one factor to consider in the overall termination of parental rights. There is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that the termination is in the best interest of the child. *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005).

The adoption specialist testified that, based on her experience, the children were adoptable and that E.H.'s behavior would not prevent a family from being interested in adopting him. DHS and the ad litem contend that this evidence was sufficient to conclude that the children were likely to be adopted. We agree. A caseworker's testimony that children are adoptable is sufficient to support an adoptability finding. *Madison v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 368, 428 S.W.3d 555.

DHS and the attorney ad litem also contend that a circuit court is required to consider only potential harm to a child's health and safety that might come from continued contact with the parents; there is no requirement to find that actual harm would result or identify the potential harm. The potential-harm analysis is to be conducted in broad terms.

*Hamman*, *supra*. Potential harm was supported by the circuit court's findings of no confidence in the parents' abstaining from corporal punishment based on their inability to be forthcoming or honest with the court. Past behavior is a predictor of a parent's likelihood of exposing a child to potential harm in the future. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. Accordingly, we affirm.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Law Office of Kathryn L. Hudson*, by: *Kathryn L. Hudson*, for appellants.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.

SLIP OPINION